**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANN MARIE PALMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 5708 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Nan R. Nolan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ann Marie Palmer claims that she is disabled due to injuries she sustained in an automobile accident. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, Ms. Palmer's motion is granted in part and denied in part, and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Ms. Palmer applied for DIB on March 7, 1994, alleging that she became disabled on October 23, 1992 due to neck pain, headaches, and pain in her hands, wrists and fingers caused by an automobile accident. The application was denied initially and again on reconsideration. (R. 177-86.) Administrative Law Judge Lovert F. Bassett held four separate hearings over a two-year period and, on December 23, 1998, found that Ms. Palmer was not disabled because she had engaged in substantial gainful activity ("SGA") prior to the expiration of her insured status on December 31, 1993. (R. 12-29.) Specifically, Ms. Palmer worked as a self-employed newspaper delivery person/driver through May 25, 1994. (R. 28.) The Appeals Council denied Ms. Palmer's request

for review on November 17, 2000, and she filed a timely complaint with the district court. In a decision dated October 12, 2001, the district court affirmed the Commissioner's decision to deny Ms. Palmer benefits, finding no error in the ALJ's conclusion that Ms. Palmer had engaged in disqualifying SGA. (R. 516-28.)

On July 12, 2002, the Seventh Circuit reversed the lower court's decision and remanded the case to the Social Security Administration for further proceedings. (R. 530-37.) The court found the ALJ patently wrong in rejecting Ms. Palmer's testimony that she was only able to work a total of four to six months between the date of her October 1992 accident and December 31, 1993. (R. 535-36.) The ALJ's finding was based on his belief that Ms. Palmer's 1993 tax return reflected that she had personally driven 40,150 miles for her newspaper delivery business in 1993. The court noted, however, that an individual may claim a tax deduction for the business use of a vehicle even when driven by another person. (R. 535.) In addition, the ALJ failed to explain why Ms. Palmer's earnings dropped by almost 50% from 1992 to 1993 despite his conclusion that she worked full time in both years. (R. 536.) Finally, the court found that "the ALJ's bias deprived [Ms.] Palmer the full and fair hearing to which she was entitled," noting that the ALJ advised Ms. Palmer to file an amended tax return correcting the mileage information, and then attacked her credibility when she did so. (R. 537.)

On May 15, 2003, the Appeals Council remanded Ms. Palmer's claim to an ALJ for further proceedings consistent with the Seventh Circuit's order. (R. 541.) On May 9, 2005, Ms. Palmer filed a claim for SSI, which does not have a requirement concerning a claimant's date last insured. A few months later, on December 28, 2005, ALJ Robert T. Karmgard held a brief hearing and requested that Ms. Palmer search for business records she may have kept concerning the number of miles she drove for her newspaper route and the nature of any help she received from friends and family. (R. 1430-57.) Over the course of five hearings spanning from June 27, 2006 to

February 22, 2007, ALJ Karmgard heard testimony from Ms. Palmer, a medical expert and a vocational expert. (R. 1458-1702.)

On April 12, 2007, the ALJ denied Ms. Palmer's claim for benefits, finding that she is capable of performing light work. (R. 479-505.) The ALJ found that Ms. Palmer's degenerative disease of the cervical spine, bilateral carpal tunnel syndrome, hypertension, history of asthma, depression and history of opiate dependence are severe impairments. The ALJ concluded, however, that Ms. Palmer retains the residual functional capacity to perform simple tasks at a sustained workmanlike pace, as long as she avoids climbing ladders, ropes and scaffolds. (R. 486.) Ms. Palmer now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Ms. Palmer was born on December 31, 1954 and was 52 years old at the time of the ALJ's decision. (R. 172.) She has a high school education and has worked as an office cleaner and a waitress. Most recently, she worked as newspaper deliverer, first on a business route, and later on a residential route. (R. 40-41, 43, 203.)

A.    **Medical History**

1.    **1992 Auto Accident**

On October 23, 1992, Ms. Palmer struck her head in an automobile accident. (R. 367.) There are no treatment records around that time, but on November 29, 1993, Dr. Allan B. Minster examined Ms. Palmer and concluded that her symptoms of backache and left and right shoulder discomfort were possibly radiculopathy.[1] (*Id.*) Dr. Minster referred Ms. Palmer to Dr. Nestor Ivkov for evaluation of cervical pain and a herniated disc at C5-C6. (R. 296.) During a December 1993

---

[1]    "Radiculopathy" is a term used to describe symptoms of pain, numbness, tingling and weakness in the arms and legs caused by a problem with the nerve roots. (http://www.back.com/symptoms-radiculopathy.html.)

examination, Ms. Palmer told Dr. Ivkov that she was experiencing almost constant numbness and clumsiness in her right arm and hand. An MRI of the cervical spine revealed degenerative disease and disc bulging at the C5-C6 level. Ms. Palmer's spinal cord "appeared to be compressed to some degree," and Dr. Ivkov remarked that "there may be compression of subarachnoid space." (*Id.*) He diagnosed "congenital cervical stenosis exaggerated by small bulging disc at C5-C6 level predominantly towards the right side," and recommended that Ms. Palmer have a whole spine myelogram and upper extremity EMG and conduction velocity studies. (R. 297.)

On February 7, 1994, Ms. Palmer underwent an MRI of the cervical spine due to complaints of right arm numbness. The test revealed moderate to severe spinal stenosis extending from the C4-C5 to C6-C7 levels, most severe at C5-C6. Dr. Pamela Donlan recommended a CT scan/post myelogram CT scan to "optimally evaluate the neuroforamin and spinal canal," which exhibited some narrowing. (R. 240, 249.) Ms. Palmer had a cervical myelogram on April 15, 1994. The test showed "[s]light widening of the rib sleeves at the C5-C6 and C6-C7 levels with mild anterior extradural impression at the C5-C6 level." (R. 236.) Ms. Palmer was referred for a post myelogram CT for further evaluation. (*Id.*)

Dr. Minster next referred Ms. Palmer to neurosurgeon Dr. Jeffrey W. Cozzens, who examined her on or about April 27, 1994. (R. 367.) Dr. Cozzens found that Ms. Palmer had limited range of motion in her neck with extension due to pain, but good strength in all muscle groups of her four extremities. She also had 25 to 50% upper extremity sensory loss. (R. 368.) A myelogram showed "a cut off of the nerve root" at C4-C5, C5-C6 and C6-C7. (*Id.*) When Ms. Palmer returned on May 2, 1994 with the results of her MRI and CT scans, Dr. Cozzens opined that she had "severe narrowing of the cervical spinal canal at C5-6 secondary to large herniated disc and spondylitic change. There is also spondylosis at C4-5 and C6-7."[2] (R. 369.) Dr. Cozzens recommended that

---

[2]     "Cervical spondylosis" is "a general term for age-related wear and tear affecting the joints in your neck." (http://www.mayoclinic.com/health/cervical-spondylosis/DS00697.)

Ms. Palmer undergo surgery with Dr. David E. Shapiro, an orthopedist. (*Id.*) After examining Ms. Palmer and reviewing her records, Dr. Shapiro agreed that she had a herniated disc at C4-C7, with bone spurring at C5-C6, and that this "correspond[ed] to her symptoms." (R. 303.)

### 2. 1994 Surgery and Disability Evaluation

On May 27, 1994, Dr. Shapiro surgically repaired Ms. Palmer's ruptured neck discs at C4 through C7 and inserted a cervical plate. (R. 307-08.) A few weeks later on June 15, 1994, Dr. Edward Ference conducted a Residual Functional Capacity Assessment of Ms. Palmer. (R. 252-59.) He concluded that by May 1995, she "should have no restrictions" in her ability to work. (R. 259.)

Dr. Shapiro conducted a follow-up examination of Ms. Palmer on July 5, 1994, and found that her arm pain had "completely resolved." (R. 306.) Ms. Palmer reported some minor numbness in her left ring and little fingers, but Dr. Shapiro found that neurological testing on her upper extremities was normal. (*Id.*) On August 25, 1994, Dr. Robert S. Baker diagnosed Ms. Palmer with major depression, single episode, explaining that she had been depressed "secondary to her physical disability." (R. 260-61.) Dr. Baker opined that the depression did impair her functioning. (R. 261.)

Dr. Shapiro examined Ms. Palmer again on September 16, 1994 and observed that she had "excellent strength to all the muscle groups in her arms" and had done "extremely well so far with the surgery." (R. 305.) He opined that her continuing neck pain radiating into the upper part of her thoracic spine was muscular in nature and referred her to a physical therapist. (*Id.*) On September 27, 1994, Dr. Carl Hermsmeyer conducted a Mental Residual Functional Capacity Assessment of Ms. Palmer. (R. 262-74.) He found her moderately limited in the ability to understand, remember and carry out detailed instructions, and concluded that she was capable of performing simple tasks. (R. 262, 264.) At that time, Ms. Palmer had only slight limitations in her ability to perform activities

of daily living and to maintain social functioning. In addition, she had only seldom deficiencies in concentration, persistence or pace. (R. 273.)

On March 17, 1995, internist Dr. Glynis Vashi examined Ms. Palmer for the Bureau of Disability Determination Services ("DDS"). (R. 310-14.) Ms. Palmer complained of constant neck pain "of a high intensity" and numbness in her left upper extremity. (R. 313.) Dr. Vashi observed that Ms. Palmer had restricted neck movements on flexion, extension, and side-to-side. Her grip strength was grade 4 in the right upper extremity and grade 4-5 in the left upper extremity. She had tenderness in her posterior cervical spine with some limitation of motion, but she had no limitation of motion in her thoracic or lumbar spine. She also exhibited no sensory deficits. (R. 312-13.)

Shortly thereafter on April 7, 1995, Dr. Pamela Spearman performed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Ms. Palmer. (R. 315-27.) Dr. Spearman opined that Ms. Palmer had "no psychological or mental conditions that are disabling," and that she was capable of performing substantial gainful activity. (R. 316.) Once again, Ms. Palmer had only slight restrictions in her activities of daily living and in maintaining social functioning, and she had only seldom deficiencies of concentration, persistence and pace. (R. 322.) Dr. Spearman concluded that Ms. Palmer was moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration, and that she was capable of performing skilled work. (R. 324, 326.)

A few days later on April 15, 1995, Dr. Charles Kenney conducted a Residual Functional Capacity Assessment of Ms. Palmer. (R. 328-35.) Dr. Kenney found Ms. Palmer capable of occasionally lifting 50 pounds; frequently lifting 25 pounds; standing, walking and sitting for six hours in an eight-hour workday; and pushing and pulling without limitation. (R. 329.) Dr. Kenney reported that Ms. Palmer could perform medium work with reasonable rest periods. (R. 335.)

### 3. Treatment in 2004 and 2005

Following the September 1994 visit with Dr. Shapiro, there is no record that Ms. Palmer sought treatment again until February 9, 2004 when she had a CT scan of her cervical spine.  (R. 1137-38.)  The scan revealed a "large disc herniation with marked associated cord compression at C3-C4."  (R. 1138.)  On February 20, 2004, Ms. Palmer reported to Evanston Northwestern Healthcare complaining of bilateral hand numbness.  (R. 719.)  The treatment notes state that Ms. Palmer reported full use of her hands prior to September 2003, but Ms. Palmer denies this.  (*Id.*)  In any event, on February 24, 2004, Dr. Cozzens performed a "C3-C4 diskectomy as well as possible placement of cadaveric bone graft for stabilization and fusion."  (R. 561.)  A Somatosensory Evoked Potential ("SSEP") study, which indicates whether the spinal cord or nerves are being pinched,[3] was conducted during the operation.  At the start of the procedure, the SSEP was "abnormal" and "worse on the right."  After the procedure, the study was "within normal limits." (R. 722-23.)

Several months later on June 9, 2004, Dr. Shapiro reviewed an x-ray which confirmed that Ms. Palmer's allograft at C3-C4 had "slipped out."  (R. 1207.)  On June 28, 2004, Ms. Palmer underwent neck surgery to correct this cervical instability.  In the first phase, doctors evaluated her vocal cord movement.   An SSEP study conducted during that procedure was "markedly asymmetric."  (R. 818, 833.)  On July 1, 2004, Dr. Shapiro performed the second phase of the surgery, including cervical fusion of the C3-C4 and C4-C5 vertebrae, and placement of "segmental fixation cervical lateral mass screws C3, C4, C5."  (R. 682.)  An SSEP study showed "[i]mproved and stable cortical somatosensory evoked responses" and "[s]uccessful utility of transcortical motor stimulation."  (R. 845.)  A Motor Evoked Potential study was "confounded by a stimulus artefact," but certain testing observations suggested "intact corticospinal function."  (R. 846.)  Dr. Shapiro recorded that "the SSEPs did not change throughout the procedure."  (R. 683.)

---

[3]     *See* http://www.allaboutbackpain.com/html/spine_diagnostics/spine_diagnostics_ ssep.html.

Ms. Palmer saw Dr. Shapiro on September 28, 2004 for a follow-up examination. Dr. Shapiro opined that Ms. Palmer's neck pain "has completely resolved" at that time. (R. 1204.) He noted that Ms. Palmer had numbness in the left hand and "significant pain about the elbow and shoulder," but he felt that the arm symptoms were unrelated to her neck, and he referred her to a hand surgeon. (*Id.*)

On April 19, 2005, Dr. Leon S. Benson performed a left carpal tunnel release operation on Ms. Palmer. (R. 1272.) On May 20, 2005, Dr. Benson reported that her hand "looks excellent," but by July 12, 2005, Ms. Palmer was again complaining to Dr. Shapiro of pain and numbness about the hand. (R. 962, 964.) Dr. Shapiro noted that Ms. Palmer did not obtain much relief from the carpal tunnel release and referred her to a neurologist for evaluation. (R. 962.)

On August 8, 2005, Dr. Scott A. Kale examined Ms. Palmer for DDS. (R. 855-58.) She exhibited 90% range of motion in her cervical spine; normal range of motion in her shoulders bilaterally; left hand grip strength of 4 out of 5; and right hand grip strength of 5 out of 5. (R. 857.) Neurological findings were normal, except for positive Tinel signs in both hands. (*Id.*) Dr. Kale diagnosed persistent left-hand numbness, bilateral carpal tunnel syndrome, and mild weakness in the left hand. (R. 858.) On August 22, 2005, Smalley Paul conducted a Physical Residual Functional Capacity Assessment of Ms. Palmer. (R. 1181-88.) The consultant opined that Ms. Palmer could frequently lift 20 pounds; occasionally lift 10 pounds; stand, walk and sit for six hours in an eight-hour workday; and push and pull without limitation. (R. 1182.) In reaching this conclusion, the consultant noted Dr. Kale's recent assessment that Ms. Palmer had no significant motor or neurological problems. (R. 1188.)

A couple of months later on October 5, 2005, Ms. Palmer underwent another MRI of the cervical spine. The test showed "essentially complete resolution of previously demonstrated cord compression and cord signal change at C3-4." (R. 958, 1131-32.) The fusion at C4-C7 was "stable" with "no evidence of recurrent stenosis." There was a slightly greater central disc

protrusion at C7-T1, but only mild narrowing of the spinal canal at that level. (*Id.*) When Ms. Palmer returned to Dr. Shapiro on December 6, 2005, she continued to complain of persistent pain in her neck and numbness in both hands. (R. 1087.) Dr. Shapiro reviewed the October 2005 MRI and confirmed "no further compression of the spinal cord." He referred Ms. Palmer for bilateral EMG/NCV and SSEP studies "to see if there was any objective reason for which disability could be offered." (*Id.*)

### 4. Treatment in 2006

On January 30, 2006, Ms. Palmer underwent an electromyogram (EMG) and a nerve conduction study. The studies revealed moderately severe carpal tunnel syndrome on the right; mild carpal tunnel syndrome on the left; and mild ulnar neuropathy distal to the distal forearm. (R. 954-55.) The examiner characterized the EMG as "mildly abnormal" and concluded that "[t]his is most likely a negative examination." (R. 955.) On April 12, 2006, Ms. Palmer presented to Dr. John McMahon for a consultation regarding her left hand numbness. (R. 979-80.) Dr. McMahon discussed Ms. Palmer's history of auto accident and surgeries, and stated that she "has been left with considerable left hand and arm sensory disturbance that compromises dexterity and functioning." (R. 979.) He noted that she had received steroid injections in both hands, and he found her to have normal strength. In addition, "carpal tunnel maneuvers [we]re negative bilaterally." (R. 979-80.) Dr. McMahon opined that based on Ms. Palmer's history of cord compression, her left arm sensory deficit was likely cervical in origin. He recommended occupational therapy to help improve hand function. (R. 980.)

On May 24, 2006, Dr. Thomas H. Hudgins of the Center for Sports and Spine Care found that Ms. Palmer had strength of 5 out of 5 bilaterally throughout the upper extremities; normal reflexes; and intact sensation. (R. 973-74.) Dr. Hudgins informed Ms. Palmer that there was "not much" he could do for her numbness aside from occupational and/or physical therapy. (R. 974.)

### B. Medical Expert Testimony

Dr. Julian Freeman, a neurologist, testified at the hearing as a medical expert ("ME"). Based on the February 1994 MRI and April 1994 myelogram, Dr. Freeman stated that between October 23, 1992 and December 31, 1993, Ms. Palmer suffered from spinal and nerve root compression "due to a mixture of disc herniation at multiple levels, and hypertrophic arthritic change." (R. 1541.) She also suffered from major depression during that time. (R. 1540.) Dr. Freeman described the clinical evaluations as "rather variable," claiming that Dr. Vashi found in March 1995 that Ms. Palmer had fairly marked upper extremity weakness, primarily in grip strength, while Dr. Cozzens opined in April 1994 that Ms. Palmer had "good strength in all muscle groups in all four extremities." (R. 1542.) In fact, as the ALJ noted, Dr. Vashi found grip strength to be grade 4 in the right hand and grade 4 to 5 in the left hand. (R. 312, 1546.) Dr. Vashi did observe, however, that Ms. Palmer had restricted neck movements on flexion, extension, and side-to-side, and some limitation of motion in the cervical spine. (R. 312-13.)

Dr. Freeman stressed that on April 12, 2006, Dr. McMahon opined that based on Ms. Palmer's history of cord compression, her left arm sensory deficit was likely cervical in origin as opposed to carpal tunnel syndrome. (R. 1543.) In light of this recent finding, Dr. Freeman testified that the March 1995 consultative examination by Dr. Vashi was "probably the correct one in terms of the weakness and the signs of cord compression." (*Id.*) Dr. Freeman found it difficult to reconcile Dr. Vashi's report and the February 1994 MRI with other clinical exams showing that Ms. Palmer's condition was "virtually normal." (R. 1545.)

Dr. Freeman also claimed that the most severe lesions of Ms. Palmer's spine were never operated on. (*Id.*) It appears, however, that the February 1994 MRI showed the most severe stenosis at the C5-C6 level, and that Dr. Shapiro performed surgery to repair the herniated discs at C4 through C7. (R. 240, 307.) In addition, Dr. Freeman stated that Ms. Palmer's 2004 SSEP studies were abnormal both before and after surgery, which "would strongly suggest that the MRI was correct and was reflecting the situation as it existed." (R. 1547-48.) The post-operative SSEP

study, however, showed "[i]mproved and stable cortical somatosensory evoked responses" and "[s]uccessful utility of transcortical motor stimulation."  (R. 845.)

In any event, Dr. Freeman opined that the February 1994 MRI was severe enough to equal Listing 11.08, spinal cord and nerve root lesions with disorganization of motor function, and was consistent with Ms. Palmer's testimony and the SSEP studies.  (R. 1545, 1549.)  The clinical notes, on the other hand, showed "no significant functional loss or limitations" such that Ms. Palmer could lift 20 pounds occasionally and10 pounds frequently.  (R. 1550, 1552.)  Dr. Freeman opined that the MRI and CT scans are more reliable diagnostic tools than the clinical exams, and speculated that if the loss of strength reflected in Dr. Vashi's report stemmed from a neck lesion, then "there would be limitations of neck range of motion to about one-third of normal, and an inability to sustain head position in a fixed manner."  (R. 1550, 1552, 1608.)  Dr. Freeman cited the abnormal June 2004 SSEP study as evidence that the clinical exams in this case were flawed, but he also acknowledged that there was no direct indication that the clinical exams were in fact deficient.  (R. 1553, 1608.)

On cross-examination, Dr. Freeman testified that the June 2004 SSEP study indicated that Ms. Palmer's nerves had been compressed for at least six months, and probably closer to eight or ten months.  (R. 1556.)  Dr. Freeman also noted Dr. Cozzens's 1994 report of significant sensory loss, and opined that the condition related back to before 1993 based on the 1994 MRI changes and the SSEP abnormality.  (*Id.*)  In Dr. Freeman's view, the evidence presented a "dichotomy," with the 1994 MRI, the SSEP studies and Ms. Palmer's testimony reflecting significant impairment, and the clinical notes reflecting no such impairment.  (R. 1559.)

At a subsequent hearing on January 31, 2007, Dr. Freeman noted that in 2004, Ms. Palmer exhibited "very severe bilateral carpal tunnel syndrome that was slightly more severe on the left."  (R. 1605.)  He also observed that the recent 2006 nerve conduction study showed only very slight

improvement on the left after surgery, and marked worsening on the right.  (*Id.*)  Given the severity of the condition, Dr. Freeman opined that it had to have started no later than 2002.  (R. 1606.)

The ALJ asked Dr. Freeman about the October 2005 MRI, which showed "essentially complete resolution of previously demonstrated cord compression and cord signal change at C3-4," and "stable" fusion at C4-C7 with "no evidence of recurrent stenosis."  (R. 958, 1131-32.)  Dr. Freeman explained that while it is possible to "relieve the actual physical compression of the cord by surgery, the damage done by the old cord compression [does] not necessarily recover and frequently does not."  (R. 1609-10.)  Once the nerve cell is crushed, Dr. Freeman stated, "it doesn't really recover all that well."  (R. 1610.)  He reiterated his concern that the clinical exams were inconsistent with the diagnostic testing, and found a similar dichotomy with respect to Ms. Palmer's carpal tunnel syndrome.  Based on the tests alone, Ms. Palmer met both Listing 11.08 and, now, Listing 11.14, peripheral neuropathies with disorganization of motor function.  (*Id.*)  Based on the clinical exams, however, Ms. Palmer could lift 20 pounds occasionally, 10 pounds frequently and push and pull without limitation.  (*Id.*)

On cross-examination, Dr. Freeman testified that Ms. Palmer's range of motion in the cervical spine would "always have been restricted to about a quarter of normal for all directions." (R. 1612-13.)  He also opined that any sustained overhead gaze beyond that quarter would be precluded.  Dr. Freeman acknowledged that the clinical exams do not record any problems with maintaining head position, but he also noted that most doctors do not test for this and that the exams did not indicate such testing occurred in this case.   He again stressed that the MRIs reflect that "sustained maintenance of the posture of the head would have been extremely difficult due to pain," and explained that a person with this condition would need to rely on a rigid cervical collar, bed rest or recumbency to relieve the pain symptoms.  (R. 1613.)

When asked again how he would reconcile the diagnostic tests and the clinical exams, Dr. Freeman opined that MRIs are 95% reliable, whereas clinical exams are only 55% reliable.  Dr.

Freeman said that he obtained these statistics from "studies in the literature," including one published "in the last six months or so." (R. 1614-15.) He did not know, however, "where the data came from" or the basis of the findings regarding clinical reliability. (R. 1615.) Dr. Freeman reiterated that the "irreconcilable differences" between the objective testing and clinical findings were so extreme as to "strongly suggest substandard clinical exams" on the part of all of the physicians. (R. 1619-20.) For example, some exams noted reduced hand grip strength on the left; others found it on the right; and still others found it in both hands. At the same time, the grip strength was routinely described as normal. In addition, the SSEP studies found no median sensory response, and the nerve conduction study found only minimal sensory response. Yet the exams indicated that sensation was normal. (R. 1619.) Also inconsistent was the fact that Ms. Palmer's May 1994 surgery was clearly indicated, "if not mandated by," the MRI, but the clinical notes "did not even begin to suggest the need for surgery." (R. 1623.)

In response to questioning from the ALJ, Dr. Freeman did concede that in cases of acute lesions such as the ones at issue here, there is a one in ten or one in 15 chance of a gross discrepancy between the diagnostic studies and the clinical observations. (R. 1553, 1620.) He described the dichotomy as "really quite rare in medical practice," however, and stated that "less than five percent of the people showed this type of discrepancy." (R. 1620.)

With respect to Ms. Palmer's testimony, Dr. Freeman agreed that severe headaches could be expected from her pathology. There was no objective evidence of these headaches, but no physician ever conducted a detailed exploration of her symptoms. (R. 1616.) Dr. Freeman stated that it would not be unusual for Ms. Palmer to experience chronic pain given the surgery she underwent and the failed fusion that needed to be repaired. Dr. Freeman explained that "when surgery is done with such advanced disc herniations and cord compression as was done, the purpose in the surgery primarily is to prevent further deterioration, not to create recovery." In other words, the surgery would help prevent paralysis but would not relieve the other problems. (R.

1617.)  Dr. Palmer also testified that Ms. Palmer's statements regarding memory loss were consistent with her multiple surgeries and anaesthesia.  (R. 1618.)

## C.    Vocational Expert Testimony

Frank Mendrick testified at the hearing as a vocational expert ("VE").  He characterized Ms. Palmer's previous work on the business paper route as unskilled and medium, and the residential paper route as unskilled and light.  (R. 1654.)  He also discussed the value of these services if the person worked full-time; part-time; and with assistance from friends and family.  (R. 1655-58, 1660-62, 1665, 1671, 1675-76.)

The ALJ described a hypothetical person of Ms. Palmer's age, education and work experience, who could occasionally lift and carry up to 50 pounds; frequently lift and carry 25 pounds; sit, stand and walk for six hours in an eight-hour workday, with normal breaks; climb ramps and stairs; frequently balance, stoop, kneel, crouch and crawl; but never climb ladders, ropes or scaffolds.  The VE testified that such an individual could perform medium work, including all of Ms. Palmer's past relevant work.  (R. 1679.)  If the same individual was limited to occasionally lifting and carrying 20 pounds and frequently lifting 10 pounds, she could perform light work, including Ms. Palmer's past work on the residential paper route.  (R. 1680.)  If the same individual did not have the capacity to recall, focus on, attend to, or carry out complex or detailed instructions, or to maintain the type of attention or concentration needed to perform complex or detailed tasks at a sustained pace, but instead could carry out simple instructions and perform simple tasks, she would be capable of light, simple work.  (R. 1680-81.)  The individual would not, however, be able to perform Ms. Palmer's past work on either paper route.  (R. 1681.)  Rather, such a person could work as an office cleaner (10,000 jobs); general assembler (6,000 jobs); and general inspector (4,000 jobs).  (R. 1681-82.)

The ALJ next refined the hypothetical to include an individual who could frequently perform fine, manipulative tasks with either hand.  The VE testified that such a limitation would not impact

14

the person's performance of Ms. Palmer's prior work or the light work previously described. If, however, the person could perform fine, manipulative tasks less than frequently, then she could not do any of that work. (R. 1682-83.) In a final modification of the hypothetical, the ALJ described a person who could occasionally lift and carry 10 pounds; frequently lift lighter items; and stand and walk up to two hours in an eight-hour workday. The VE stated that such a person would be limited to sedentary work, including general assembly (3,000 jobs); inspection (1,200 jobs); and general labor (800 jobs). (R. 1683-84.) The VE also explained that these jobs would require frequent ability to perform fine, manipulative tasks. (R. 1684.)

On cross-examination, the VE testified that a person who could not hold her head in one position for prolonged periods of time, even with normal breaks, could not perform any work activity. (R. 1694.) If the person needed to recline her head for two minutes per hour, that would not be acceptable to an employer. (R. 1695.) The VE agreed that unscheduled breaks of more than a minute or so would "raise the red flag." (R. 1696.)

The VE provided Dictionary of Occupation Titles ("DOT") numbers for the jobs he identified, and testified that he determined the number of available jobs in each category by modifying a Department of Labor source and *Employment Statistics Quarterly* according to his own observations. (R. 1689-90, 1696.) The VE explained that he collects his own data and then compares it to the official reports to obtain a better sense of the local job market. He did not retain the reports he made and would not be able to provide a copy to Ms. Palmer's attorney. (R. 1697-99.)

D.      **The ALJ's Decision**

The ALJ found that Ms. Palmer's degenerative disease of the cervical spine; bilateral carpal tunnel syndrome; hypertension; asthma by history; depression; and history of opiate dependence are all severe impairments, but that they do not meet or equal one of the impairments listed in the

Social Security Regulations.  (R. 486, 501-02.)  The ALJ determined that Ms. Palmer has the residual functional capacity ("RFC") to perform light work, including (1) occasionally lifting, carrying, pushing and pulling up to 20 pounds; (2) frequently lifting, carrying, pushing and pulling up to 10 pounds; (3) sitting, standing and walking for six hours in an eight-hour workday; (4) occasionally climbing ramps or stairs; (5) occasionally balancing, stooping, kneeling, crouching and crawling; (6) frequently performing fine manipulative tasks; (7) recalling, focusing on, attending to and carrying out simple instructions; (8) performing simple tasks at a sustained workmanlike pace; but (9) not climbing ropes, ladders or scaffolds.  (R. 486.)

In reaching this conclusion, the ALJ did not make a finding as to whether Ms. Palmer had engaged in substantial gainful activity ("SGA") since October 23, 1992, but suggested that she had. (R. 484-86.)  The ALJ went on to discuss the extensive diagnostic and clinical findings, giving significant weight to the clinical observations of the multiple treating and evaluating sources over a period of years.  (R. 500.)  The ALJ concluded that Ms. Palmer's testimony regarding the intensity, persistence and limiting effects of her symptoms was "not entirely credible" in light of the "objective clinical medical findings contained in the record, and physician observations of the claimant, over a period of several years."  (R. 503.)  The ALJ accepted the VE's testimony that given Ms. Palmer's RFC, she could perform a significant number of jobs in the national economy. (R. 504.)

<u>**DISCUSSION**</u>

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing this decision, the court may not engage in its own analysis of whether Ms. Palmer is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner."  *Id.* (citation omitted).  The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence."  *Id.* (citing 42 U.S.C. § 405(g)).  Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion."  *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision."  *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted).  The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion."  *Young,* 362 F.3d at 1002.  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.    Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.[4]  *Keener v. Astrue*, No. 06-CV-0928-

---

[4]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*  The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*

MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Ms. Palmer raises several arguments in support of her request for a reversal and remand: (1) the ALJ erred in failing to make a determination at step one of the analysis; (2) the ALJ erred in evaluating Dr. Freeman's testimony and in making the RFC determination; (3) the ALJ failed to conduct a proper assessment of Ms. Palmer's credibility; and (4) the VE's testimony was not supported by substantial evidence. The court addresses each in turn.

### 1.    Step One Analysis

Ms. Palmer first objects that the ALJ failed to make a finding at step one of the analysis in violation of the Seventh Circuit's direct order. (Pl. Mem., at 22.) In its July 12, 2002 opinion, the Seventh Circuit reversed the ALJ's conclusion that Ms. Palmer had engaged in SGA prior to the expiration of her insured status on December 31, 1993, and remanded the case for further proceedings. (R. 530-37.) On remand, ALJ Karmgard opted not to resolve this issue before proceeding with his analysis of the remaining steps. Ms. Palmer argues that this is "unjust, and suggests bias" because if the case is reversed and remanded on other grounds, ALJ Karmgard could "turn around and rule against Ms. Palmer at step one." (Pl. Mem., at 23.) Defendant

concedes that "ideally the ALJ would have made a step-one finding," but insists that any error in that regard was harmless because the ALJ went on to analyze steps two through five. (Def. Mem., at 20.)

Ms. Palmer first filed a claim for benefits more than 14 years ago. Her claim was considered on appeal to the district court in 2001 and to the Seventh Circuit in 2002, and the remand proceedings took nearly four more years. Despite the fact that the only issue addressed by both the district court and the Seventh Circuit was Ms. Palmer's SGA prior to December 31, 1993, ALJ Karmgard did not resolve this matter. The ALJ engaged in a rather extensive discussion of the SGA evidence, but then merely suggested that Ms. Palmer "has not met her burden of establishing that work activity was not substantial gainful activity." (R. 484-86.) This constitutes error. *See Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1045 (N.D. Ill. 2007) ("[T]he ALJ erred by not complying with [district court] remand orders" to reevaluate the claimant's peripheral neuropathy and bilateral carpal tunnel syndrome.)

On the facts of this case, the court finds that the ALJ made "a de facto finding that [Ms. Palmer] has not been engaged in substantial gainful activity" when he proceeded to an analysis of steps two through five. *Kleinfelter v. Astrue*, No. 07 C 50182, Doc. 38, at 11 (N.D. Ill. Sept. 15, 2008) (citing 20 C.F.R. § 404.1520(a)(4) and (b)). Defendant insists that "factual finding[s] [are] best left for the [Commissioner] to address in the first instance," arguing that the record here is "not so clear" as to allow the court to make a step one determination. (Def. Mem., at 20-21 (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993).) Defendant, however, has not offered any explanation as to why a finding that Ms. Palmer did engage in SGA is warranted here. It is hereby settled that, for purposes of this 14-year-old claim for benefits, Ms. Palmer did not engage in SGA prior to the expiration of her insured status date.

**2.    The Medical Evidence**

Ms. Palmer next argues that the case must be remanded because the ALJ improperly rejected Dr. Freeman's conclusion that the diagnostic tests were more reliable than the clinical exams. Dr. Freeman opined that the 1994 MRI, SSEP studies, nerve conduction studies and surgical procedures establish that Ms. Palmer's impairments meet or equal Listings 11.08 and 11.14, and render her unable to work. Defendant argues that the ALJ properly declined to give Dr. Freeman's opinion dispositive weight in light of the treatment history, Ms. Palmer's testimony, the clinical findings, and inconsistencies in the diagnostic studies. (Def. Mem., at 15.) Defendant first stresses that Ms. Palmer did not seek any treatment from 1994 until 2004, and claims that the ALJ "could reasonably rely on this silence as a reason to give greater weight to the clinical observations." (*Id.* at 16.) In Defendant's view, the ALJ fairly accepted that Ms. Palmer was "asymptomatic for almost 10 years." (*Id.* (citing February 2004 treatment note); R. 719.)

Failure to seek medical treatment may be inconsistent with a claim of debilitating impairments. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005). Here, however, the ALJ did not offer this as an explanation for rejecting Dr. Freeman's opinion or for disregarding Ms. Palmer's testimony. In discussing the extensive medical history, the ALJ noted, by way of transition, that the medical record was silent for a period of time, but he failed to connect this period of silence to any of his conclusions. (R. 493, 503.) This is not adequate. *See Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) (an ALJ "must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning."); *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.")

In addition, even assuming the ALJ relied on the gap in treatment in rejecting Ms. Palmer's credibility, he did not consider whether she had any explanation for her failure to seek regular medical care. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (quoting SSR 96-7p)) ("[T]he ALJ 'must not draw any inferences' about a claimant's condition from this failure [to seek treatment]

unless the ALJ has explored the claimant's explanations as to the lack of medical care.") During the January 31, 2007 hearing, Ms. Palmer tried at one point to explain the gap in treatment, but the ALJ did not allow her to. (R. 1600.) Later in the hearing, Ms. Palmer told the ALJ that she could not "get any help" because she did not have insurance or any money to pay for treatment. (R. 1637, 1641.) The ALJ, however, did not ask Ms. Palmer to elaborate on this statement, nor did he mention it in his decision. SSR 96-7p (an explanation for not seeking medical care may include that the claimant is "unable to afford treatment" and does not have "access to free or low-cost medical services.") Thus, Ms. Palmer's failure to seek treatment for a period of time is not substantial evidence supporting the ALJ's decision to give greater weight to the clinical exams.

Defendant next argues that Ms. Palmer told Dr. Shapiro that she was pain free as of July 2004. (Def. Mem., at 16.) To be sure, Dr. Shapiro wrote a letter to Dr. Cozzens in September 2004 stating that Ms. Palmer's "neck pain has completely resolved." (R. 1204.) The ALJ reasonably construed this against Ms. Palmer's more recent testimony that her pain never went away. *See Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008) ("It was well within the ALJ's authority to disregard [the claimant's] testimony because it conflicted with what she told Dr. Ko.") Nevertheless, the ALJ needed to do more to explain his decision to credit the clinical exams over the opinion of Dr. Freeman. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (quoting *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.")

Defendant contends that the ALJ did just that by explaining how the diagnostic studies on which Dr. Freeman relied were either "offset by another laboratory finding" or "questionable on [their] face." (Def. Mem., at 17.) Indeed, the ALJ provided an extensive summary of both the medical evidence and Dr. Freeman's opinions regarding that evidence. (R. 486-500.) The ALJ noted, for example, Dr. Shapiro's findings that Ms. Palmer's arm pain had "completely resolved" as

21

of July 1994, and that she had "excellent strength to all the muscle groups in her arms" as of September 1994. (R. 305-06, 489-90.) Dr. Freeman found it suspicious that Ms. Palmer's May 1994 surgery was essentially "mandated by" the MRI, but that the clinical notes "did not even begin to suggest the need for surgery." As the ALJ pointed out, however, Dr. Cozzens stated that the surgery was "certainly indicated," and Dr. Shapiro performed the procedure after confirming that the pathology was consistent with Ms. Palmer's complaints. (R. 303, 369, 489.)

The ALJ also discussed Dr. Vashi's March 1995 conclusion that Ms. Palmer suffered from chronic neck pain syndrome with restricted neck movements, but that her grip strength was grade 4 out of 5 on the right, and grade 4-5 out of 5 on the left. (R. 314, 491.) Dr. Freeman characterized this as marked upper extremity weakness and opined that, notwithstanding the inconsistent treating source reports, the degree of reduction in Ms. Palmer's strength was consistent with the compression pathology reflected in the 1994 MRI. (R. 498.) Dr. Freeman further opined that Dr. McMahon's April 2006 evaluation, though occurring after a slipped disc required additional surgery in 2004, was also consistent with the presence of upper extremity weakness back in 1994. The ALJ noted, however, that Dr. McMahon found Ms. Palmer to have normal strength and reflexes, which belied any claim of strength limitations dating back to 1994. (R. 498.)

The ALJ next acknowledged Dr. Freeman's testimony that the June 28 and July 1, 2004 SSEP studies were abnormal both pre- and post-operatively. (R. 498, 499A, 1617.) The ALJ also observed, however, that the July 1, 2004 SSEP study showed only "minimally asymmetric cortical responses during surgery," and that "[t]he overall impression was improved and stable cortical somatosensory evoked response" and "successful utility of transcortical motor stimulation." (R. 494, 845.) In addition, following the July 2004 surgery, Dr. Shapiro reported that Ms. Palmer's neck pain had completely resolved. (R. 494, 1204.)

On May 20, 2005, Dr. Benson reported that Ms. Palmer's left hand looked "excellent" following a carpal tunnel release operation and that the surgery had been helpful. (R. 495, 962,

22

964, 1272.) Dr. Freeman disagreed, opining that the nerve conduction study reflected severe and long-standing carpal tunnel that was present since 2002. As the ALJ noted, however, there was no clinical report of carpal tunnel syndrome prior to February 2004. (R. 499.) On January 30, 2006, an EMG showed moderately severe carpal tunnel syndrome on the right, and mild carpal tunnel syndrome on the left. The ALJ noted that, "[a]lso indicated was isolated, mild ulnar nerve neuropathy at the forearm . . . [but that] no concurrent physical examination information was provided and no specific limitations upon activity were presented." (R. 496.) Dr. Freeman opined that Ms. Palmer's carpal tunnel was long-standing, but Dr. McMahon found that carpal tunnel maneuvers were negative bilaterally. (R. 496.) Dr. McMahon also opined that the left sensory deficits were likely surgical in origin, but on examination, there was an absence of median sensory deficit. (R. 496.)

The ALJ discussed the August 2005 consultative exams, which found a 10 degree loss of cervical flexion, extension and rotation; left hand grip strength of 4/5 and right hand grip strength of 5/5; and an ability to perform light work activity. (R. 495.) The ALJ also cited Dr. Benson's August 2005 observation that Ms. Palmer's digital motion was normal, and that she herself "note[d] a lot of improvement." (R. 496, 960.) The ALJ next noted that the October 2005 MRI showed essentially complete resolution of the earlier cord compression, and no evidence of recurrent stenosis. (R. 496.) The ALJ acknowledged Dr. Freeman's opinion that it is possible to "relieve the actual physical compression of the cord by surgery, [but that] the damage done by the old cord compression [does] not necessarily recover and frequently does not." (R. 499A, 1609-10.) The ALJ also noted Dr. Freeman's statement, however, that the overall record of clinical examination and evaluation by the treating physicians was not indicative of significant limitation. (R. 499A.)

The ALJ discussed each instance where Dr. Freeman opined that the clinical findings were inconsistent with the diagnostic tests, including his opinion that Ms. Palmer met Listings 11.08 and 11.14 based on the diagnostic imaging. Dr. Freeman described the "irreconcilable differences"

between the objective testing and clinical findings as so extreme as to "strongly suggest substandard clinical exams" on the part of all of the physicians. He acknowledged, however, that there was "no direct evidence suggestive of improper or deficient examination procedure." (R. 499, 1553, 1608.) In addition, Dr. Freeman testified that in his experience, imaging results and clinical observations which are facially inconsistent may both be accurate. In cases of acute lesions (like Ms. Palmer's), Dr. Freeman stated, there is a one in ten or one in 15 chance of a gross discrepancy between the diagnostic studies and the clinical observations. (R. 499, 1553, 1620.) Dr. Freeman did describe that type of dichotomy as "really quite rare in medical practice," such that "less than five percent of the people showed this type of discrepancy." (R. 1620.) As the ALJ explained, however, crediting Dr. Freeman's opinion "would require rejection of the clinical observations of multiple treating sources over a period of years." (R. 500.) Dr. Freeman agreed that the clinical findings of those treating and examining sources were consistent with each other, and would support a conclusion that Ms. Palmer is capable of performing SGA.

Ms. Palmer makes much of Dr. Freeman's reference to recent studies suggesting that MRI imaging is 95% accurate, whereas clinical evaluations are only 55% accurate. The ALJ discussed this conclusion, but also noted that the ME was unable to provide the source of these figures. (R. 499-500, 1615.) The ALJ fairly summed up the "matter in issue" as "essentially a conflict between the degree of functional limitation which can be expected or predicted based upon imaging and diagnostic testing, and the reported actual observations of multiple sources regarding such functionality." (R. 500.) The ALJ considered all of the conflicting medical evidence before determining that the clinical observations were entitled to controlling weight. As noted, this court cannot "reweigh the evidence or substitute [its] own judgment for that of the ALJ." *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ's decision to credit the clinical observations over the diagnostic tests and the ME's opinion is supported by substantial evidence.

### 3. Ms. Palmer's Credibility

Ms. Palmer disagrees, noting that her own testimony was entirely consistent with Dr. Freeman's conclusions, and claiming that her statements further supported the supremacy of the diagnostic testing. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

In finding Ms. Palmer's testimony not fully credible, the ALJ again relied on the "objective clinical medical findings contained in the record, and physician observations of the claimant, over a period of several years." (R. 503.) This includes (1) Dr. Shapiro's findings that Ms. Palmer's arm pain had "completely resolved" as of July 1994, and that she had "excellent strength to all the muscle groups in her arms" as of September 1994; (2) Dr. Vashi's March 1995 conclusion that Ms. Palmer suffered from chronic neck pain syndrome with restricted neck movements, but that her grip strength was grade 4 out of 5 on the right, and grade 4-5 out of 5 on the left; (3) Dr. Shapiro's July 2004 report that Ms. Palmer's neck pain had completely resolved; (4) Dr. Benson's May 20, 2005 report that Ms. Palmer's left hand looked "excellent" following a carpal tunnel release operation and that the surgery had been helpful; (5) Dr. Benson's August 2005 observation that Ms. Palmer's digital motion was normal, and that she herself "note[d] a lot of improvement"; and (6) the October

2005 MRI showing essentially complete resolution of the earlier cord compression, and no evidence of recurrent stenosis.

The ALJ also discussed Ms. Palmer's testimony regarding her symptoms. For example, the ALJ described how Ms. Palmer complained of pain and numbness in her hands and arms; continued severe and worsening neck pain; reduced ability to turn her head; problems holding things and balancing; weekly headaches; depression; difficulty sitting and standing due to pain; inability to walk more than 20 feet; inability to lift or carry more than 10 pounds; and memory loss. (R. 487-88.) The ALJ expressly noted where Ms. Palmer disagreed with the clinical findings, including (1) the February 2004 note stating she had full use of her hands prior to September 2003; and (2) an August 17, 2004 note that all of her residual arm and neck pain had resolved. (R. 488, 1205.) The ALJ also pointed out where the clinical record conflicted with Ms. Palmer's testimony, such as (1) "no detailed suggestion of any . . . on-going activity" with respect to headaches; (2) "no significant on-going concern" with memory loss; and (3) "no limitations of on-going significance" with respect to grip strength. (R. 499A.)

With respect to Ms. Palmer's activities of daily living, the ALJ discussed both her testimony at the hearing and the reports she made to counselors at the Lake County Substance Abuse Program. (R. 487, 490-92.) In February 1996, for example, Ms. Palmer was to "continue child care & janitorial work," and a July 1997 Initial Assessment stated that Ms. Palmer reported being independent in all areas of self-care, including cooking, shopping, cleaning and social interaction. (R. 364-64, 492, 1231-40.) A June 2001 assessment again noted that Ms. Palmer was capable of cooking, cleaning, and shopping. (R. 493, R. 1221-32.) Finally, the ALJ described Ms. Palmer's testimony regarding her pain and its limiting effects. (R. 486-88.)

The court is satisfied that the ALJ's credibility determination was not "patently wrong" in most respects. Two issues, however, require further analysis. Dr. Freeman testified that the cervical imaging was consistent with Ms. Palmer's claim that she cannot hold her head in one

position or engage in repetitive grasping.  There is no evidence that the treating or examining physicians tested for these limitations, but the ALJ concluded that this did not "render physician clinical observations invalid."  (R. 499A.)  In the court's view, given the absence of any clinical observations as to Ms. Palmer's head movement and grasping ability, the ALJ did not adequately explain his reasons for rejecting Ms. Palmer's testimony as to those limitations, which was consistent with Dr. Freeman's analysis and, in his view, supported by the diagnostic imaging. Significantly, the VE testified that a person who is unable to hold her head in one position for prolonged periods of time, even with normal breaks, would not be capable of performing any work activity.  (R. 1694.)

In addition, the ALJ found Ms. Palmer capable of "frequently" performing fine manipulative tasks.  (R. 486.)  Dr. McMahon, however, stated in April 2006 that Ms. Palmer "has been left with considerable left hand and arm sensory disturbance that compromises dexterity and functioning." (R. 979.)  Both Dr. McMahon and Dr. Hudgins noted that Ms. Palmer experienced numbness, which is consistent with Dr. Kale's August 2005 finding that Ms. Palmer had "persistent left-hand numbness."  (R. 858, 974, 980.)  The consultative examiner relied on Dr. Kale's report in finding Ms. Palmer unlimited in her ability to perform fine manipulation, but he made no mention of the numbness or its effect on such tasks.  (R. 1184.)  Even Dr. Shapiro agreed in September 2004 and again in December 2005 that Ms. Palmer was experiencing hand numbness.  (R. 1087, 1204.)  In light of these findings and Dr. Freeman's corresponding testimony that Ms. Palmer's carpal tunnel syndrome is severe, the ALJ failed to adequately explain why he rejected Ms. Palmer's testimony and found her capable of frequently performing fine, manipulative tasks.  The case must be remanded for further evaluation of these issues.

### 3.    The VE's Testimony

Before concluding its analysis, the court addresses Ms. Palmer's additional argument that the case must be remanded because the ALJ based his decision on unreliable VE testimony.

27

Specifically, Ms. Palmer claims that the ALJ failed to satisfy his step five burden of providing evidence showing that Ms. Palmer can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). The Seventh Circuit has stated that a VE is "free to give a bottom line" regarding available jobs, but "the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). Data is not available on demand "where the VE testified that her figures were based on government statistics and her own surveys but had not prepared a written report, did not bring any reference materials to the hearing, and could not provide citations to the materials on which she relied." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) (citing *McKinnie*, 368 F.3d at 910-11). Nor is data properly available if the claimant must pay for the VE to produce it. *McKinnie*, 368 F.3d at 911.

Here, the VE identified the number of available jobs by modifying a Department of Labor source and *Employment Statistics Quarterly* according to his own observations. (R. 1689-90, 1696.) The VE explained that he collects his own data and then compares it to the official reports to obtain a better sense of the local job market. (R. 1697-99.) Ms. Palmer argues that the VE's data was not available on demand because he clearly testified that he did not keep any copies of his survey reports. (Pl. Mem., at 13.) Defendant disagrees, stressing that Ms. Palmer's attorney never made a demand for the VE to produce the original data, or to recreate it. (Def. Mem., at 11) (citing *Donahue*, 279 F.3d at 446) (where claimant's counsel "did not ask the vocational expert about the genesis of the numbers or the reason for the discrepancy," the ALJ was "entitled to accept the vocational expert's conclusion.")

A review of the record reveals that Ms. Palmer's attorney did ask the VE for his underlying sample studies, more than once:

Q:      Do you have anything that you've put together that you could show me, a kind of report, indicating how you modified the numbers from these two publishing sources?

A:      Well, I don't have it, I don't keep it because it's just something private for me.

* * * *

Q:      [F]or these numbers that you gave us today, the reports and the studies you did, you don't have them any more? You just have the conclusions, you don't actually have the reports that you've done?

A:      The reports I did?

Q:      Yes.

A:      No, I don't keep my. I've only been asked this question twice. I never had the need to keep them. The next one I do I'll keep, I can tell you that.

Q:      So you don't have anything to show us how you did the, went through the methods to come up with these numbers?

A:      Just what I explained.

Q:      Okay. But nothing you can give to me so that I could see that?

ALJ:    He's already said he doesn't have any written documents on it.

ATTY: Okay.

(R. 1697, 1699.) The VE made it very clear that he did not keep his reports and had nothing to give to Ms. Palmer's attorney for review.

Unlike the VE in *McKinnie*, however, the VE here did provide the relevant DOT citations for each of the jobs he identified, and the ALJ satisfied his duty under SSR 00-4p to confirm that the VE's testimony was consistent with the DOT. (R. 1688-90.) *See also Donahue*, 279 F.3d at 446-47; *Henning v. Astrue*, 578 F. Supp. 2d 996, 1012 (N.D. Ill. 2008) (one method for a claimant's representative to verify that job titles correspond to the DOT is "to ask the VE to provide the relevant DOT citations."). The VE also gave Ms. Palmer's attorney a copy of a sample page of the census codes he relied on and, as noted, cited to a Department of Labor source and to *Employment Statistics Quarterly*. (R. 1693.) *C.f., Duke v. Astrue*, No. 1:07-CV-00188, 2008 WL 3992251, at *6

(N.D. Ind. Aug. 27, 2008) (remanding case where the VE "provided no data or citations for the references he relied upon in forming [his] opinion.") (internal quotations omitted).  Ms. Palmer's attorney did not request any additional information.

The VE arguably made available sufficient data to support his conclusion regarding the number of jobs available to someone with Ms. Palmer's RFC.  Nevertheless, on remand, the ALJ should take the opportunity to make further inquiry into this issue and confirm that the VE's data and conclusions were sufficiently available and reliable.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment or remand [Doc. 21] is granted in part and denied in part.  Defendant's Motion for Summary Judgment [Doc. 36] is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: February 5, 2009

_____
NAN R. NOLAN
United States Magistrate Judge